# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 14, 2016         Decided July 19, 2016
Reissued December 20, 2016

No. 15-5051

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE EXECUTIVE OFFICE
FOR UNITED STATES ATTORNEYS AND UNITED STATES
DEPARTMENT OF JUSTICE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00269)

———

*Yaakov M. Roth* argued the cause for appellant. With him on the briefs were *Kerri L. Ruttenberg* and *Julia Fong Sheketoff*.

*Jason W. Burge*, *Alysson L. Mills*, and *Jesse C. Stewart* were on the brief for *amici curiae* Sixty-three law professors in support of appellant.

*John D. Cline* was on the brief for *amici curiae* American Civil Liberties Union, et al. in support of appellant.

*Timothy P. O'Toole* and *Addy Schmitt* were on the brief for *amici curiae* The Constitution Project and The Innocence Project in support of appellant.

*Lewis Yelin* argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen*, *Jr.*, Acting U.S. Attorney, and *Leonard Schaitman*, Attorney.

Before: SRINIVASAN, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Concurring opinion filed by *Senior Circuit Judge* SENTELLE, with whom *Senior Circuit Judge* EDWARDS joins.

SRINIVASAN, *Circuit Judge*: The National Association of Criminal Defense Lawyers submitted a request under the Freedom of Information Act to obtain an internal Department of Justice publication known as the Federal Criminal Discovery Blue Book. The Blue Book is a manual created by the Department to guide federal prosecutors in the practice of discovery in criminal prosecutions. It contains information and advice for prosecutors about conducting discovery in their cases, including guidance about the government's various obligations to provide discovery to defendants.

The Department refused to disclose the Blue Book, invoking the Freedom of Information Act's Exemption 5, which exempts from disclosure certain agency records that would be privileged from discovery in a lawsuit with the agency. The Department maintained that the Blue Book fell within the attorney work-product privilege, and therefore Exemption 5, because it was prepared by (and for) attorneys

in anticipation of litigation. The district court agreed that the Blue Book is privileged attorney work product and thus is exempt from disclosure. We likewise conclude that the Blue Book consists of exempt attorney work product, but we remand to the district court for an assessment of whether the Blue Book also contains non-exempt policy statements amenable to reasonable segregation from the privileged work product.

## I.

### A.

The Freedom of Information Act (FOIA) provides that government agencies must make agency records available to citizens upon request, subject to nine enumerated exemptions. 5 U.S.C. § 552. "Congress intended FOIA to permit access to official information long shielded unnecessarily from public view." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal citations and quotation marks omitted). The statutory exemptions, accordingly, "are explicitly made exclusive and must be narrowly construed." *Id.* (internal citations and quotation marks omitted).

Under Exemption 5, agencies may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 covers records that would be "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). The exemption allows the government to withhold records from FOIA disclosure under at least three privileges: the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854,

862 (D.C. Cir. 1980). This case solely involves the last of those privileges, the attorney work-product privilege.

B.

On December 20, 2012, the National Association of Criminal Defense Lawyers (NACDL) sent a FOIA request to the Department of Justice (DOJ) seeking disclosure of the Blue Book. DOJ processed the request under the direction of Susan Gerson, Assistant Director in the FOIA/Privacy Act Staff of the Executive Office for U.S. Attorneys. After reviewing the Blue Book and consulting with DOJ staff familiar with the Book's inception and drafting, Gerson determined that it should be withheld in full pursuant to FOIA Exemptions 5 and 7(E). (The latter exemption, which we have no occasion to reach, exempts certain types of "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(E).) On February 28, 2013, Gerson sent NACDL a form letter invoking both exemptions and denying its request.

After unsuccessfully appealing the denial, NACDL brought this FOIA suit in the district court seeking to compel DOJ to release the Blue Book. The parties filed cross-motions for summary judgment, and DOJ again invoked Exemptions 5 and 7(E) in support of its decision to withhold the Blue Book in full. Because the parties disagreed about how to characterize the Blue Book's contents, the district court reviewed the Book *in camera* before rendering its decision on the merits of DOJ's decision to withhold.

Following its *in camera* review of the Blue Book, the district court granted DOJ's motion for summary judgment. *Nat'l Ass'n of Criminal Def. Lawyers v. Exec. Office for U.S. Attorneys*, 75 F. Supp. 3d 552 (D.D.C. 2014). The court

found that DOJ was not required to disclose any portion of the Blue Book, holding that the Book in its entirety is protected as attorney work product. *Id.* at 557, 561. Because the court found that the Blue Book could be withheld in full under Exemption 5, it did not address the applicability of Exemption 7(E). *Id.* at 556.

## II.

NACDL appeals, arguing that the claimed FOIA exemptions are inapplicable and the Blue Book therefore should be disclosed in full. We review the district court's decision de novo. *See Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005). In doing so, we must "ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure under the FOIA." *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998)) (quotation marks omitted). When making that determination, we rely centrally on the agency's descriptions of the content of the relevant documents as set forth in its *Vaughn* index and accompanying affidavits. *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977). We conclude that the Blue Book consists of attorney work product which is exempt from disclosure under FOIA's Exemption 5.

## A.

Courts have long recognized that materials prepared by one's attorney in anticipation of litigation are generally privileged from discovery by one's adversary. *See Hickman v. Taylor*, 329 U.S. 495, 510-12 (1947); *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998). The attorney work-

product privilege applies in both civil and criminal cases. *See United States v. Nobles*, 422 U.S. 225, 236-38 (1975); Fed. R. Civ. P. 26(b)(3); Fed. R. Crim. P. 16(a)(2), 16(b)(2)(A).

The privilege aims primarily to protect "the integrity of the adversary trial process itself." *Jordan v. Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc). It does so by "provid[ing] a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Coastal States*, 617 F.2d at 864. Without the privilege, "much of what is now put down in writing would remain unwritten" because "[a]n attorney's thoughts, heretofore inviolate, would not be his own." *Hickman*, 329 U.S. at 511. Protecting attorney work product from disclosure prevents attorneys from litigating "on wits borrowed from the adversary." *Id.* at 516 (Jackson, J., concurring).

"Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5" to the FOIA. *Sears*, 421 U.S. at 154. Not every document created by a government lawyer, however, qualifies for the privilege (and thus, the exemption). "[I]f an agency were entitled to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated." *Coastal States*, 617 F.2d at 865. To avoid that result, we have long required a case-specific determination that a particular document in fact was prepared in anticipation of litigation before applying the privilege to government records. *See, e.g.*, *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586-87 (D.C. Cir. 1987).

In ascertaining whether a document was prepared in anticipation of litigation, we have applied a "'because of' test,

asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *Sealed Case*, 146 F.3d at 884). For that standard to be met, the attorney who created the document must have "had a subjective belief that litigation was a real possibility," and that subjective belief must have been "objectively reasonable." *Sealed Case*, 146 F.3d at 884.

## B.

We find those standards satisfied with regard to the Blue Book. DOJ explains that "[t]he Blue Book was designed to provide advice regarding the law and practice of federal prosecutors' discovery disclosure obligations and to serve as a litigation manual to be used by all DOJ prosecutors and paralegals" in their cases. Goldsmith First Decl. ¶ 5 (J.A. 93). As a result, DOJ says, the Blue Book was "created in anticipation of reasonably foreseeable litigation," namely, federal criminal prosecutions. Gerson Decl. ¶ 17 (J.A. 84); *see id.* ¶ 20 (J.A. 85). We agree.

The Blue Book "describ[es] the nature and scope of [federal prosecutors'] discovery obligations under applicable constitutional provisions, caselaw, and the Federal Rules of Criminal Procedure." Gerson Decl. ¶ 20 (J.A. 85). It consists of "nine chapters, written by DOJ prosecutors with expertise in a wide range of discovery-related topics," addressing subjects including: Federal Rule of Criminal Procedure 16, regarding discovery; the government's obligations to disclose exculpatory information under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972); disclosure duties arising from the Jencks Act, 18 U.S.C.

§ 3500; items protected from disclosure; and the use of protective orders and *ex parte* and *in camera* submissions in discovery. Goldsmith First Decl. ¶ 5 (J.A. 93).

According to DOJ, the Blue Book is not a "neutral analysis of the law" but rather "contain[s] confidential legal analysis and strategies to support the Government's investigations and prosecutions." Gerson Decl. ¶ 21 (J.A. 86). In contrast with publicly-available documents such as the United States Attorneys' Manual, which set out statements of agency policy, the Blue Book is an internal manual containing litigation strategies. Goldsmith Second Decl. ¶ 7 (J.A. 103). It gives "practical 'how-to' advice," Goldsmith First Decl. ¶ 5 (J.A. 94), to federal prosecutors about "how to handle different scenarios and problems," Gerson Decl. ¶ 20 (J.A. 85). It discusses "the types of challenges [prosecutors] may encounter in the course of prosecutions and potential responses and approaches." Goldsmith Second Decl. ¶ 8 (J.A. 103); *accord* Goldsmith First Decl. ¶ 14 (J.A. 99). The Book "contemplates facts that may arise in judicial proceedings" and evaluates "how a court would likely consider those facts." Goldsmith First Decl. ¶ 6 (J.A. 94).

DOJ thus argues that disclosing the Blue Book would "essentially provide a road map to the strategies federal prosecutors employ in criminal cases." *Id.* It contends that disclosure would afford anyone who wanted to read the Blue Book (including opposing counsel) "unprecedented insight into the thought processes of federal prosecutors." *Id.* ¶ 12 (J.A. 98). Disclosure thus would "undermine the criminal trial process by revealing the internal legal decision-making, strategies, procedures, and opinions critical to the Department's handling of federal prosecutions." *Id.* ¶ 13 (J.A. 98). In addition, it would "severely hamper the adversarial process[,] as DOJ attorneys would no longer feel

free to memorialize critical thoughts on litigation strategies for fear that the information might be disclosed to their adversaries to the detriment [of] the government's current and future litigating positions." *Id.*

Taking into account the nature, content, and function of the Blue Book as described in DOJ's affidavits, we believe it "can fairly be said to have been prepared . . . because of the prospect of litigation." *Deloitte*, 610 F.3d at 137 (quoting *Sealed Case*, 146 F.3d at 884). Our *in camera* review of the Blue Book confirms that the affidavits accurately describe the Book and its contents. The Book therefore consists of protected attorney work product.

## C.

NACDL does not dispute that the Blue Book was prepared for use in litigation. It claims that the Blue Book nonetheless falls outside the work-product privilege for three reasons: (i) the Blue Book was not prepared in anticipation of litigating a specific claim or case; (ii) the Blue Book principally serves a non-adversarial function; and (iii) the Blue Book's content resembles that of a neutral treatise. We find each of those arguments unpersuasive.

### 1.

NACDL's principal contention is that the Blue Book cannot qualify for the work-product privilege because, even if it was created in contemplation of litigation generally, it was not prepared in anticipation of litigating a specific claim or case. NACDL reads our decisions to establish a specific-claim requirement for government documents to qualify for work-product protection, at least in the context of

government-initiated litigation such as criminal prosecutions. NACDL misunderstands our decisions.

As an initial matter, we have long held that there is no general, overarching requirement that a governmental document can fall within the work-product privilege only if prepared in anticipation of litigating a specific claim. *See Sealed Case*, 146 F.3d at 885; *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992); *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 126-28 (D.C. Cir. 1987). In *Schiller*, for instance, we held that the privilege covered NLRB documents providing direction and advice to agency lawyers on the litigation of cases under the Equal Access to Justice Act. 964 F.2d at 1208. We specifically rejected the contention "that the work-product doctrine requires that the documents be created in anticipation of litigation over a specific claim." *Id.* "Exemption 5 extends to documents prepared in anticipation of foreseeable litigation," we explained, "even if no specific claim is contemplated." *Id.* (citing *Delaney*, 826 F.2d at 127).

That is not to say that anticipation (or non-anticipation) of a specific claim can never have any relevance when assessing the applicability of the work-product privilege. The contemplation of specific claims can help differentiate situations in which lawyers have litigation adequately in mind from those in which lawyers are not (yet) sufficiently anticipating litigation.

Our decision in *Coastal States Gas Corporation v. Department of Energy*, 617 F.2d 854, is illustrative. *Coastal States* involved memoranda drafted by Department of Energy lawyers to assist Department auditors in interpreting agency regulations. The auditors used the memoranda when auditing firms for compliance with agency regulations. Those audits

were not considered "investigations," because, "at that point, no charge had been made nor was a violation necessarily suspected." *Id.* at 858. But if an auditor subsequently determined that a firm had committed a violation, the audit could turn into a more targeted investigation and, in some cases, give rise to litigation. *See id.* at 858-60.

We denied application of the work-product privilege to the memoranda in *Coastal States*, finding "no indication . . . that there was even the dimmest expectation of litigation when the[] documents were drafted." *Id.* at 865. We said that "[t]o argue that every audit is potentially the subject of litigation is to go too far." *Id.* The Department thus had "failed to carry its burden of establishing that litigation was fairly foreseeable at the time the memoranda were prepared." *Id.* We distinguished the memoranda from documents "prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind." *Id.* Accordingly, in a later case involving documents prepared "in the course of an investigation" that "had reached the stage . . . at which [the agency] was comparing the accumulated facts to the caselaw and evaluating" specific legal theories to pursue, we held that litigation was "sufficiently 'in mind' for [the] document[s] to qualify as attorney work product." *SafeCard Servs. Inc. v. SEC,* 926 F.2d 1197, 1203 (D.C. Cir. 1991).

In both *Coastal States* and *SafeCard*, we used language suggesting that, for the documents in question to be prepared with an enforcement action sufficiently on the horizon to implicate the work-product privilege, the agency's investigation must have advanced to the point that the documents' authors contemplated bringing "a specific claim supported by concrete facts." *SafeCard*, 926 F.2d at 1202 (quoting *Coastal States*, 617 F.2d at 865). In neither case, however, did we establish any across-the-board specific-claim

prerequisite for application of the privilege. Indeed, as noted, we later specifically disavowed any such specific-claim requirement in *Schiller*, 964 F.2d at 1208.

Rather, the point of the specific-claim inquiry in *Coastal States* and *SafeCard* was to differentiate between audits as to which enforcement litigation might well never take place, *Coastal States*, 617 F.2d at 865, and active investigations with an enforcement action foreseeably at hand, *SafeCard*, 926 F.2d at 1202-03. In those cases, looking at whether agency attorneys were contemplating a specific claim proved useful in assessing the likelihood that litigation would ever come to pass. At an early stage, such as a neutral compliance audit with no specific claim (or even any violation) in mind, there is insufficient reason to anticipate litigation. But for documents created at a later stage in which the agency contemplates bringing a specific action, disclosure might reveal the government's "legal theories," "weigh[ing of] facts and evidence," or "candid[] evaluat[ion]" of a case. *See Coastal States*, 617 F.2d at 864.

We face a very different situation here. A specific-claim requirement would make little sense in the context of the Blue Book. Unlike the audit documents at issue in *Coastal States*—which might well never be used (or be of use) in litigation—the Blue Book is *entirely* about the conduct of litigation. It is aimed directly for use in (and will inevitably be used in) litigating cases. Its disclosure therefore risks revealing DOJ's litigation strategies and legal theories regardless of whether it was prepared with a specific claim in mind. It was prepared with the litigation of *all* charges and *all* cases in mind. The presence or absence of a specific claim or transaction might be a helpful consideration in the context of an agency compliance inquiry with no enforcement action or litigation necessarily on the horizon. But it is an unhelpful

consideration here given that the Blue Book undoubtedly was created in anticipation of—and for use in—foreseeable litigation, i.e., federal criminal prosecutions.

NACDL relies heavily on our decision in *Sealed Case*, 146 F.3d 881. There, we considered the applicability of the work-product privilege to a lawyer's notes and other documents prepared in anticipation of a possible action brought against the lawyer's client. We found the documents were covered by the privilege even though no specific claim against the client had yet emerged. *See id.* at 885-86. In discussing the significance of the fact that no specific claim had arisen by the time of the documents' creation, we drew a distinction between two types of cases. First, we pointed to *Coastal States* and *SafeCard* in observing that, in prior cases in which "the documents at issue had been prepared by government lawyers in connection with active investigations of potential wrongdoing," we had required anticipation of a specific claim in order to invoke the work-product privilege. *Id.* at 885. By contrast, in cases like *Schiller*, in which lawyers acted "not as prosecutors or investigators of suspected wrongdoers, but as legal advisors protecting their agency clients from the possibility of future litigation," we rejected the need for a specific claim to implicate the privilege. *Id.* at 885-86. The facts in *Sealed Case* fell into the latter category.

This case, according to NACDL, fits within the former category because it involves lawyers acting "as prosecutors." While that may be so, *Sealed Case* did not hold that, in *any* case involving documents prepared by or for prosecutors, the work-product privilege could apply only if the documents had been created in anticipation of a specific claim. Instead, because *Sealed Case* did not involve documents created by prosecutors, we expressly declined to address whether "the

*Coastal States/SafeCard* specific claim test has any continued vitality when government lawyers act as prosecutors or investigators of suspected wrongdoers." *Id.* at 885. And as we have explained, the existence (or non-existence) of a specific claim proved salient in those cases as a means of identifying whether documents had been prepared at a time when litigation was sufficiently in mind—i.e., whether "litigation was a real possibility." *Id.* at 884. But in the case of a document like the Blue Book, prepared entirely for use in wholly foreseeable (even inevitable) litigation, there is no need to apply any specific-claim test to conclude that litigation is sufficiently likely to warrant application of the work-product privilege.

2.

NACDL next argues that the Blue Book falls outside the work-product privilege because it aims to advance a non-adversarial function—namely, education and training of prosecutors. NACDL advocates drawing a line between (unprivileged) documents that convey agency policy and (potentially privileged) documents that help the agency prevail in court. Whatever the validity of such a line, it would not advance NACDL's cause because the Blue Book was designed to help federal prosecutors prevail in court on behalf of the government.

We have long recognized that the applicability of the work-product privilege can turn in significant measure on a document's function. *See Delaney*, 826 F.2d at 127 (citing *Coastal States*, 617 F.2d at 858). And we agree with NACDL that materials serving no cognizable adversarial function, such as policy manuals, generally would not constitute work product. *See Coastal States*, 617 F.2d at 863. The Blue Book, however, *does* serve an adversarial function.

The Book does not merely pertain to the subject of litigation in the abstract. Instead it addresses how attorneys on one side of an adversarial dispute—federal prosecutors—should conduct litigation. It describes how to respond to the other side's arguments, which cases to cite, and what material to turn over and when to do so, among numerous other practical and strategic considerations. The Blue Book, for instance, "describes the types of claims defense counsel have raised and could raise regarding different discovery issues, or the tactics they could employ in litigation . . . and the arguments prosecutors can make to respond to these claims." Gerson Decl. ¶ 21 (J.A. 85).

In any event, insofar as the Blue Book might also serve non-adversarial functions, "a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation." *Deloitte*, 610 F.3d at 138. As a result, "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status." *Id.* In that light, any educational or training function the Blue Book might serve would not negate the document's adversarial use in (and its preparation in anticipation of) litigation. The Blue Book therefore qualifies for the work-product privilege.

3.

NACDL also argues that a neutral recitation of legal rules or case law in the manner of a treatise, as opposed to a description of a lawyer's litigation strategy or theory of the case, fails to qualify as attorney work product. That distinction is of no assistance to NACDL because the latter category more fairly describes the Blue Book than does the former.

In *Schiller*, we found the work-product privilege applicable to "lawyer-prepared documents containing tips and advice for litigating cases under the Equal Access to Justice Act." *Sealed Case*, 146 F.3d at 885 (describing *Schiller*). Much like the documents at issue in *Schiller*, the Blue Book contains case-handling tips and tactical advice for litigating discovery matters in criminal prosecutions: "in addition to legal analysis," the Blue Book includes "a comprehensive set of strategic considerations, procedures, and practical advice for conducting criminal prosecutions," much of which is "interspersed within the legal analysis." Goldsmith First Decl. ¶ 9 (J.A. 96).

As a result, unlike "neutral" accounts of government policy like the United States Attorneys' Manual, the Blue Book imparts litigation strategy to government lawyers: it conveys "advice on criminal discovery practices, potential strategic and logistical concerns, interpretations of law and risk assessments in light of relevant legal authority, . . . practice notes, techniques, procedures, and legal strategies that in-the-field prosecutors may and do employ during the course of criminal proceedings." *Id.* ¶ 6 (J.A. 94). As with the tips and advice in *Schiller*, the Blue Book thus consists of exactly the "sort of information—prepared in anticipation of litigation—[which] falls within the attorney work-product privilege and, therefore, within [E]xemption 5." *Schiller*, 964 F.2d at 1208.

To be sure, the Blue Book contains certain information—such as "compilations of cases," Gerson Decl. ¶ 21 (J.A. 85)—that may come with a seeming air of neutrality if considered in strict isolation. But disclosure of the publicly-available information a lawyer has decided to include in a litigation guide—such as citations of (or specific quotations from) particular judicial decisions and other legal sources—

would tend to reveal the lawyer's thoughts about which authorities are important and for which purposes. The Blue Book, for instance, does not include lists of cases in a vacuum. It instead "offers compilations of cases that prosecutors can use to support different arguments" in litigation as well as "[c]ases illustrating potential pitfalls that prosecutors should avoid" when conducting discovery. *Id.* (J.A. 85-86). That sort of information squarely implicates the work-product privilege.

## III.

Finally, NACDL argues that, even if certain portions of the Blue Book qualify as work product and thus are exempt from disclosure, DOJ must disclose any non-exempt portions. NACDL relies on the FOIA's direction to agencies to disclose any non-exempt "portion" of a record containing exempt material if the non-exempt parts are "reasonably segregable." 5 U.S.C. § 552(b). And as we have long held, "[t]he focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data*, 566 F.2d at 260.

As the district court noted, however, an agency need not segregate and disclose non-exempt material if a record is "fully protected" as work product. *Nat'l Ass'n of Criminal Def. Lawyers*, 75 F. Supp. 3d at 557 (quoting *Judicial Watch,* 432 F.3d at 371). In such cases, because the entire record is exempt from disclosure, there are no non-exempt portions left to segregate. The district court found that the Blue Book is fully protected as work product and thus did not undertake a separate segregability analysis. *Id.* at 561.

In cases involving voluminous or lengthy work-product records—the Blue Book is more than 500 pages in length—we think it generally preferable for courts to make at least a preliminary assessment of the feasibility of segregating non-exempt material. When reviewing such records *in camera*, courts may look at "what proportion of the information in a document [appears to be] non-exempt and how that material is dispersed throughout the document." *Mead Data*, 566 F.2d at 261. Material is more likely to be reasonably segregable in longer documents with "logically divisible sections." *See id.* at 261 n.54. In such cases, courts presumably would examine each section to determine if it might be amenable to segregation and disclosure. Such a determination also may be possible on the basis of the agency's *Vaughn* index and affidavits, if those materials suggest that a lengthy work-product record likely contains segregable material.

We recognize that "FOIA places the burden of justifying nondisclosure on the agency seeking to withhold information, and this burden cannot be shifted to the courts by sweeping, generalized claims of exemption for documents submitted for in camera inspection." *Id.* at 260. But when an agency has maintained all along that a record is "fully protected" as work product, its *Vaughn* index and affidavits may not address segregability. In such cases, it may be that portions of the record which otherwise appear to contain neutral information are encompassed within (and integrated with) protected work product and thus there is no portion that is "reasonably segregable." But there may also be cases in which a record containing some amount of work product also contains—or at least appears to contain—segregable, non-exempt material subject to disclosure. In that circumstance, a court presumably would require the agency to provide "a description of which parts of the withheld documents are non-

exempt . . . and either disclose them or offer adequate justification for continuing to withhold them." *Id.*

In this case, the government acknowledges that it has already publicized its general policy statements about federal prosecutors' discovery obligations. In its response to the petition for rehearing filed after we issued our original (and hereby superseded) opinion in this case, the government emphasized that the Department of Justice "*has* made public the agency policy governing federal prosecutors' discovery obligation," and provided website links to pertinent sections of the United States Attorneys' Manual and three memoranda issued by the Deputy Attorney General addressing the topic. Gov't Resp. to Pet. for Reh'g 11-12. The government's submissions in this case also confirm that the Blue Book contains a discussion of those policy statements. *See* Gov't Br. 46, 61-62. One of the government's declarations, for instance, notes that Chapter 1 of the Blue Book is entitled, "Department of Justice Policy, Positions, and Guidance." Goldsmith Second Decl. ¶ 7 (J.A. 103).

In light of the government's submissions, we think it appropriate to assess whether the Blue Book contains non-exempt statements of policy that are reasonably segregable from the protected attorney work product and that therefore should be disclosed. Because the district court did not consider whether the Blue Book contains reasonably segregable statements of the government's discovery policy, we remand for that court to conduct that analysis in the first instance. Such an analysis, we have explained, does not call for parsing the Blue Book "line-by-line" or segregating material "dispersed throughout the document." *Mead Data*, 566 F.2d at 261. Instead, the emphasis is on segregation of non-exempt material found in "logically divisible sections." *Id.* at 261 n.54. If the district court concludes that the Blue

Book contains non-exempt and reasonably segregable statements of the government's discovery policy, the court could then consider whether Exemption 7(E) of FOIA would protect any of that material from disclosure. The district court to this point has had no occasion to examine the government's argument that Exemption 7(E) shields the Blue Book from disclosure.

\*   \*   \*   \*   \*

For the foregoing reasons, we affirm the judgment of the district court in part and remand for an assessment of whether the Blue Book contains non-exempt and reasonably segregable statements of discovery policy.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, with whom *Senior Circuit Judge* EDWARDS joins, concurring: I concur in the decision of the majority, not because I believe it to be the correct result, but because I am compelled to do so by precedent. Boiling the controversy down to its essence, the answer to one two-part question determines the result: Does the attorney work-product privilege protected by FOIA Exemption 5 protect only information prepared in anticipation of litigating a specific claim; and if not, does it extend far enough to encompass a text prepared for the education of attorneys who may in the future be generally involved in litigation? The majority, I believe correctly, opines that this circuit has answered that question in *Schiller v. NLRB*, 964 F.2d 1205 (D.C. Cir. 1992), and has further restated the answer in *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998). In this case, we consider a manual prepared for internal use of the Department of Justice concerning the important legal area of criminal litigation discovery. The manual was prepared not for use in a specific piece of litigation, but for the whole universe of cases that might be encountered by the Department's criminal attorneys. Likewise, in *Schiller*, the relevant documents at issue in a FOIA proceeding were prepared to provide tips for the handling of questions that might come up in Equal Access to Justice Act litigation. 964 F.2d at 1208. In *Schiller*, as reiterated in *In re Sealed Case*, we held that the attorney work-product privilege adopted in Exemption 5 of the FOIA protected the disputed document. *Id.* at 1208-09. Although I think the normative and perhaps ethical implications of extending this protection to a prosecutorial manual are sufficient to give pause, I cannot see any legal difference between this case and *Schiller* which would permit us to reach a different result.

We are bound by the prior decisions of this circuit as much as those of the Supreme Court. *See, e.g.*, *Sierra Club v. Jackson*,

648 F.3d 848, 854 (D.C. Cir. 2011) ("It is fixed law that 'this Court is bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court.'" (quoting *Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005)). *Schiller*, as restated in *Sealed Case*, held that we found the work-product privilege applicable to "lawyer-prepared documents containing tips and advice for litigating cases under the Equal Access to Justice Act." *Sealed Case*, 146 F.3d at 885 (analyzing and restating *Schiller*). Unless and until the Supreme Court or an en banc decision by this court overrules or modifies *Schiller*, we must enter decisions consistent with that holding. I hope to see the day when such a reversal or modification occurs, for more than one reason.

First, I believe that *Schiller* was wrongly decided in the first instance. As the majority notes, the purpose in the privilege adopted into Exemption 5 is "to protect 'the integrity of the adversary trial process itself.'" Maj. Op. at 5 (quoting *Jordan v. Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc)). That purpose is served by allowing a litigating attorney "a 'zone of privacy' within which to think, plan, weigh facts and evidence . . . ." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980). That goal is accomplished by an exemption which protects from disclosure the litigation decisions and related information in the handling of specific litigation. I grant that it is possible to interpret Exemption 5 broadly; that does not mean it is appropriate to do so. The exemptions to FOIA are "explicitly made exclusive . . . and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982) (other citations and internal quotations omitted)).

Furthermore, applying the broad construction of *Schiller* to the case before us is inconsistent both with the statutory purpose of FOIA and the longstanding values of justice in the United

States. The purpose of the Freedom of Information Act is to serve "the citizens' right to be informed about what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (internal quotation marks omitted). There is no area in which it is more important for the citizens to know what their government is up to than the activity of the Department of Justice in criminally investigating and prosecuting the people. The government certainly has the power to claim a FOIA exemption to hide its internal manuals describing how it goes about that awesome undertaking. But if it chooses to exercise that power, then the people might be forgiven for cynically asking "what is it you have to hide?"

Reflecting on the consistency of *Schiller*'s interpretation of Exemption 5 with the original statutory purposes, one may recall, as does the majority, that the exemption was to protect attorneys in litigation as under the privilege traditionally afforded in litigation itself. I cannot help but wonder if an insurance defense attorney had written a secret treatise passed around among his bar on how to defend—for example—defective product cases, would we, if that treatise became relevant in specific litigation, afford the protection of the attorney-client privilege to a document not prepared for a particular client or a particular case, but only to educate attorneys of a particular sort in the litigation of a particular kind of case? I think not. But even if we did, I do not think this would justify stretching the FOIA exemption to the point of protecting the departmental tactics and strategies in criminal prosecution from discovery by the citizenry. I cannot help but recall the words of Justice Sutherland for the Supreme Court in *Berger v. United States*:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose

> obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor–indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

295 U.S. 78, 88 (1935).

It is often said that justice must not only be done, it must be seen to be done.  Likewise, the conduct with the U.S. Attorney must not only be above board, it must be seen to be above board.  If the people cannot see it at all, then they cannot see it to be appropriate, or more is the pity, to be inappropriate.  I hope that we shall, in spite of *Schiller*, someday see the day when the people can see the operations of their Department of Justice.

In short, I join the judgment of the majority, not because I want to, but because I have to.