David P. EVANS, et al., Plaintiffs,

v.

J. Brian ATWOOD, Administrator, and the United States Agency for International Development, Defendants.

No. CIV. A. 96-2746 (RMU) (JMF).

United States District Court, District of Columbia.

Nov. 18, 1997.

Burton Fretz, Los Angeles, CA, for Plaintiffs.

Rudolph Contreras, Assistant United States Attorney, Washington, DC, for Defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

### Nature of the Case

Plaintiffs in this class action claim they lost their jobs in a reduction in force ("RIF") at the United States Agency for International Development ("AID") because of their age. The matter comes before the undersigned magistrate judge on the plaintiffs' motion to compel discovery.[1]

### Discovery Disputes

The parties have reached an impasse as to four discovery issues. The most complicated, by far, is whether the attorney-client and attorney work product privileges protect from discovery documents which the defendants otherwise would make available to the plaintiffs.

Second, the plaintiffs also complain that the defendants should be required to answer Interrogatory No. 2 which requires them "to identify all documents, data compilations, and tangible things in the possession, custody or control of defendants that are relevant to the facts alleged in the complaint." Defendants object to that interrogatory as "vague, ambiguous, overbroad and burdensome," Defs.

---

1. This Memorandum Opinion resolves a discovery dispute which was briefed by the parties in letters to the Court pursuant to the Court's scheduling order of April 7, 1997 [# 21]. The plaintiffs' two letters of July 15, 1997, [# 25] and July 31, 1997, [# 26] shall be deemed the opposition to the motion to compel.

Letter of July 25, 1997, and point out that they have made a fulsome disclosure of all the documents pertaining to the reduction in force.

Third, the plaintiffs also question whether they have received all of the documents they sought by a request for a production of documents because they have seen no "deliberative or decisional documents of policy-level agency officials." Pls. Letter of July 15, 1997.

Finally, the plaintiffs demand that defendants tell them what their affirmative defenses will be. Defendants, pointing out that they have produced over 100,000 documents, insist that they have held no such documents back and that they cannot be forced at this point to state what their affirmative defenses will be.

### Outline of this Opinion

Section I of this opinion deals with the issues pertaining to the documents while Section II deals with whether the defendants must answer the disputed interrogatory, produce deliberative process documents, or disclose their affirmative defenses at this stage of the litigation. Appendix A contains a chart detailing the disposition of the privilege claim as to each of the disputed documents.

## I. The Disputed Documents

### A. The Attorney–Client Privilege

#### 1. Scope of the Privilege

An examination of the withheld documents indicates that the lawyers were active participants in planning and designing the reduction in force. Agency officials charged with creating the RIF sought their formal, written opinions or their more informal guidance. The withheld documents are either from or to the attorneys, or, if not, they refer to the written or oral statements the attorneys had made.

■ The defendants contend that all the documents from or to the attorneys are privileged, in whole or in part, because the attorney-client privilege protects from disclosure what the attorney tells the client as well as what the client tells the attorney to secure

her advice. They therefore object to plaintiffs discovering documents which contain either kind of communication. This Circuit, however, more narrowly defines the attorney-client privilege to protect from disclosure the communications made by the client to the attorney for the purpose of seeking legal advice. *Tax Analysts v. Internal Revenue Service,* 117 F.3d 607, 617 (D.C.Cir.1997). The privilege protects the communications made by the attorney to the client only insofar as the attorney's communications disclose the confidential communication from the client. *Brinton v. Department of State,* 636 F.2d 600, 603–604 (D.C.Cir.1980). *See* *Schlefer v. United States,* 702 F.2d 233, 244 (D.C.Cir.1983); *Coastal States Gas Corporation v. Department of Energy,* 617 F.2d 854, 862 (D.C.Cir.1980); *Mead Data Central v. United States Department of the Air Force,* 566 F.2d 242, 253 (D.C.Cir.1977).

■ The Court of Appeals has also indicated that the attorney-client privilege exists in a governmental context, i.e., in the relationship between the lawyers who work in an agency and the agency officials who call upon them for legal advice. *Tax Analysts v. Internal Revenue Service, supra,* 117 F.3d at 617. It is all too facile to then reason that, since that is so, whatever an agency official tells a lawyer is protected from disclosure. If a man confides in his lawyer that he wishes to provide for an illegitimate child in his will with the lawyer promising never to disclose that fact while the client lives, the client's confidence ("I am the father of an illegitimate child") is protected. The privilege exists to encourage other clients to provide their lawyers with similar confidences so that the lawyer gets the information she needs to provide effective assistance and sound advice. If, on the other hand, an agency official asks the lawyer whether a particular statute gives one person a priority as against another in a reduction in force, the agency official has not communicated to the lawyer any information that is confidential, i.e., unknown by anyone except the client who has disclosed it for the purpose of securing the advice. Learning that the agency was contemplating a RIF and sought a lawyer's advice as to how to comply with the

pertinent laws hardly discloses a confidential communication.

It could be argued, of course, that, since one can deduce from the lawyer's opinion that the client must have inquired of the lawyer whether the statute gave the priority, the privilege has been breached because what the client implicitly told the lawyer—"I need advice as to a certain topic"—has been disclosed. But, the attorney-client privilege has never been construed to prevent the disclosure that a person retained the attorney for a particular purpose. *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 602 (8th Cir.1977) (purpose for which law firm retained not privileged). *Accord Colton v. United States,* 306 F.2d 633, 636 (2d Cir. 1962); *Westhemeco Ltd. v. New Hampshire Insurance Co.,* 82 F.R.D. 702, 707 (S.D.N.Y. 1979); J. Weinstein & M. Berger, *Weinstein's Evidence Manual* § 18.03[3][d] ("The general rule in the federal courts is that identifying facts about the client, or the scope or objective of the employment, are not treated as confidential communications to which the privilege applies."). Learning that purpose does not necessarily disclose what the client might have told the attorney in confidence once the attorney had been retained. By the same logic, that an agency attorney's advice was sought as to a particular matter is not in itself privileged even if it discloses the client's desire for that advice.

Protecting from disclosure that a person consulted a lawyer for a particular purpose and sought the lawyer's guidance as to a particular legal question might encourage persons who consult lawyers to be that much more frank when they discuss the matters that concern them with their counsel than they would otherwise be. Following that logic, the privilege would shield even the fact that the client sought the lawyer's advice as to a particular matter, although, while doing so, the client did not communicate to the lawyer any information that would be confidential, *i.e.,* uttered with the expectation that no one but the lawyer would ever hear it. Understandably, situations can be conjured where this would be true and a court might well protect from disclosure the mere fact that the client consulted a lawyer for a par-

ticular purpose. A prudent public official might well be reluctant to have the world know that she consulted counsel about election financing laws when the press has speculated about the propriety of a substantial contribution to his last campaign. In that situation it may be perfectly appropriate to shield his consultation lest other public officials be deterred from seeking counsel's advice. But, in the absence of such a situation, to always shield the mere fact that the attorney's advice was sought as to a particular question, renders the privilege absolute.

To justify that absolute privilege, in turn, one would have to say that preventing the disclosure of the reason why the client sought the advice is so essential to the frankness the privilege seeks to protect that even the fundamental purpose of the trial—to ascertain the truth—must yield to it. That cannot possibly be true of every case. In some situations the privilege will have to shield the information—*e.g.,* the public official described above—but in other situations it will have no effect on that frankness whatsoever. The situation presented by this case illustrates the difference. There are certainly documents in which the client officials say things the disclosure of which would defeat reasonable expectations that what they told in confidence would not thereafter see the light of day. Disclosure of such information might well deter similarly situated agency officials from candid discussions with agency lawyers.

On the other hand, in other documents, they simply seek legal advice as to a certain issue intending, one supposes, to rely on that advice in conforming the RIF to the law so that, for example, in the event of criticism of the RIF, they can establish that they predicated their acts on sound legal advice. Persons who have sought legal advice without communicating confidential information will not be less frank than they should be in communicating in the future with agency counsel merely because the world only learns that they sought legal advice as to a particular matter. To nevertheless grant such innocuous communications a privilege cannot create an incremental gain in the frankness between attorney and client which justifies

the impediment to the search for the truth that such an absolute privilege unquestionably causes.

But, one cannot leave the matter there and say that therefore plaintiffs are entitled to all the documents. If the attorney-client privilege is to continue to exist in a governmental context, the privilege must protect from disclosure those communications that were truly confidential in a governmental context as much as it does in a non-governmental context. "Confidential" means that the agency official said or wrote something to a lawyer to secure legal advice with the intention that it not be known by anyone other than the lawyer.[2] The information is to be protected if one can say that the person who communicated the information never intended it to be disclosed and, but for its disclosure now, it would never have been known.

 If, as is true of many of the documents, the client official sought the opinion without disclosing any confidential information, the existence of the opinion and its contents are not privileged. *Mead Data Central v. United States Department of the Air Force, supra,* 566 F.2d at 253.[3] Denying the privilege in that situation hardly defeats any expectation the client had and will not inhibit potential clients from confiding truly confidential information in their attorneys. Restricting the privilege to only that factual information, otherwise unknown, which the client official communicated to the attorney meets the official's reasonable expectation that it would never be disclosed. The restriction is the only path permitted by controlling law and strikes the required balance between disgorging relevant information wherever it exists in the search for the truth

without inhibiting future agency officials from disclosing to agency lawyers what they truly and fairly think will never see the light of day because they only intended their lawyer to know it. Thus, having articulated in the abstract the proper scope of the attorney-client privilege in this case, the Court has applied the standard to each document for which the privilege is claimed. Its reasoning as to the appropriate disposition of the privilege for each document is set out in Appendix A.

 A subset of these documents is *sui generis* and requires separate, additional analysis. These are documents that passed between officials and lawyers during negotiations between AID and the union representing employees affected by the RIF. The documents indicate that, during the course of those negotiations, agency officials, seeking legal advice, disclosed to agency counsel explicitly or implicitly the agency's bargaining position as to a certain issue and sought counsel's advice as to the legal validity of that position or the contrary position taken by the union. To hold that the seeking of such advice is not a privileged communication because the law does not ordinarily protect the reason why the client consulted a lawyer is, in this particular context, naive and unreasonable. It defeats the justified expectation that what the agency official told the lawyer and learned would not be ultimately disclosed to the union after the negotiations ended. Such a cramped reading of the privilege, besides destroying reasonable expectations, would inhibit the agency officials from seeking such advice which would in turn inhibit negotiations between the union and the agency.

---

2. "A communication is in confidence within the meaning of [the attorney-client privilege] if, at the time and in the circumstances of the communication, the communicating person reasonably believes that no one will learn the contents of the communication...." *Restatement (Third) of the Law Governing Lawyers* § 121 (Proposed Final Draft No. 1, 1996). *Accord C. McCormick on Evidence* § 91 at 333 (J. Strong ed. 1992) ("It is of the essence of the privilege that it is limited to those communications which the client expressly made confidential or which he could reasonably assure under the circumstances would be understood by the attorney as so intended.")

3. "The description of documents 1 and 5 gives no indication as to the confidentiality of the information on which they are based. It simply states the subject, source, and recipient of the legal opinion rendered. In the federal courts the attorney-client privilege does extend to a confidential communication from an attorney to a client, but only if that communication is based on confidential information provided by the client. The Air Force has not shown that the information on which the legal opinions in documents 1 and 5 were based meets this confidentiality requirement...." *Id.* at 152.

The law, however, favors such settlements and negotiations, and, in this narrow area involving a handful of documents, the search for the truth must yield to encouraging the candid and frank discussion with counsel that, in this case, occurred during those negotiations. Accordingly, the Court has held that documents from agency officials to lawyers and from lawyers to officials which disclose the position AID took (or contemplated taking) in negotiations are shielded from disclosure by the attorney-client privilege.[4]

### 2. The Waiver Claim

█ The Court rejects plaintiffs' notion that there can be identified with precision a group of agency officials who alone could claim privilege and who forfeited it by circulating information provided by the lawyer beyond that group. The focus of the privilege is on what the client official told the lawyer in the first place. What the lawyer said to the client official is not privileged, except insofar as it discloses what the client official told the attorney in confidence. That an agency official circulated the attorney's opinion is irrelevant to what the agency official told the agency lawyer in the first place. Additionally, circulating truly confidential information among concerned officials does not defeat the privilege since all the recipients shared the attorney-client privilege with each other.

It is the clear teaching of *Upjohn Company v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), that a "control group" test must be rejected in favor of a pragmatic recognition of how the policies underlying the attorney-client privilege will or will not be advanced by permitting certain persons, or the organization by whom they are employed, to claim it. It is one thing to find a waiver when an organization makes available documents to a government agency and then tries to claim that they are privileged. It is another for agency officials working on a common problem to share with each other confidential information which one of them may have communicated to an attorney. It is hard to understand why their sharing of that information with each other

constitutes a waiver of the privilege they have to communicate that information to an agency lawyer. When a corporation gives confidential information to Government Agency X it has distributed the information beyond the corporation. In that instance, the organization has spread the information beyond the organization and has no privilege to keep the confidential information from Government Agency Y. That is nothing like the agency official's communicating with her colleague what she intends to tell an agency lawyer, or what the lawyer has told her, when both officials and the lawyer are working for a common employer.

### B. The Work Product Privilege

Fed.R.Civ.P. 26(b)(3) protects from ordinary disclosure "documents ... otherwise discoverable ... prepared in anticipation of litigation and for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent....)" Defendants claim this "work product" exemption from ordinary discovery for four documents.

The concept captured by the words "in anticipation of litigation and for trial" has a temporal and motivational dimension:

> At the risk of stating the obvious (which generally becomes obvious only after it has been stated), the concept of "in anticipation of litigation" contains two related, but nevertheless distinct, concepts. One is temporal. The other is motivational. To be "in anticipation of" litigation, a document must have been prepared before or during the litigation. That temporal element, standing alone, however, is not sufficient. The document or material must have also been prepared *for* litigation and not *for some* other purpose. It is the second concept that is determinative for the work-product protection. Thus, materials may be prepared before or when litigation is imminent or pending without necessarily having been prepared "in anticipation" of litigation from a motivational point of view.

---

4. The documents to which the Court refers are Nos. 29, 35 and 41.

Epstein. *The Attorney–Client Privilege and the Work–Product Doctrine, supra,* at 314.

In *Jordan v. United States Department of Justice,* 591 F.2d 753 (D.C.Cir.1978), the Department of Justice claimed the work product exemption for documents which guided prosecutors in the exercise of their discretion in deciding, for example, whether a person should be charged with a crime and prosecuted or diverted from the criminal justice system. The Court of Appeals rejected the claim:

> The work-product rule does not extend to every written document generated by an attorney; it does not shield from disclosure everything that a lawyer does. Its purpose is more narrow, its reach more modest. The Supreme Court articulated the rule's rationale in the *Hickman* [*v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947) ] case:
>
>> Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.
>
> It is clear from this statement that the purpose of the privilege is to encourage effective legal representation within the framework of the adversary system by removing counsel's fears that his thoughts and information will be invaded by his adversary. In other words, the privilege focuses on the integrity of the adversary trial process itself and seeks to ensure that such proceedings do not degenerate into mere "battles of wits." This focus on the integrity of the trial process is reflected in the specific limitation of the privilege to materials "prepared in anticipation of litigation or for trial."

In view of the work-product rule's underlying rationale, we think it clear that the Manual and FOT Guidelines sought by appellee do not fall within this privilege.

> Neither the Manual nor the Guidelines were prepared in anticipation of a particular trial; in fact, they were not even prepared in anticipation of trials in general. Rather, these documents were promulgated as general standards to guide the Government lawyers in determining whether or not to bring an individual to trial in the first place. The guidelines and instructions set forth in these documents do not relate to the conduct of either on–going or prospective trials; they do not include factual information, mental impressions, conclusions, opinions, legal theories or legal strategies relevant to any on-going or prospective trial. The public disclosure of these guidelines could have no conceivable effect on the actual conduct of an on-going or prospective trial.

*Id.* at 775. *Accord United States v. Gulf Oil Corporation,* 760 F.2d 292, 296 (Temp.Emergency Court of Appeals 1985) (inquiry is to determine primary motivating purpose behind creation of document: "If the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated."); *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir.1981) (to qualify as work product "primary motivating purpose behind the creation of the document was to aid in possible future litigation."); *First Pacific Networks, Inc. v. Atlantic Mutual Insurance Co.,* 163 F.R.D. 574, 582 (N.D.Cal. 1995) ("When it is clear that documents would have been prepared independent of any anticipation of use in litigation (*i.e.* because some other purpose or obligation was sufficient to cause them to be prepared) no work product protection can attach."); *Sterling Drug Inc. v. Harris,* 488 F.Supp. 1019, 1026 (S.D.N.Y.1980) ("It must still be shown that the documents were prepared by or at the request of an attorney to prepare for the upcoming litigation.").

The work product exemption is inapplicable to the four documents because none of them were created for the purpose of advancing the agency's interests or defending its position in litigation growing out of the RIF.

■ Two of the four documents (Nos. 61 and 108) deal with the staffing levels in the General Counsel's office. They were created not to prepare for trial but to secure permission to hire more attorneys for that office (No. 108) or to explain the detrimental consequences of any further reduction in the number of attorneys assigned to that office (No. 61). While one (No. 108) refers to the need for lawyers to defend against this lawsuit, disclosure of its contents in no way threatens the disclosure of what those lawyers have done and will do to prepare for trial nor their thought processes as they prepare for trial.

■ A third document (No. 107) advises employees of the defendant agency that plaintiffs had filed this lawsuit and provides guidance as to how to prepare responses for documentation and how to handle inquires about the lawsuit. Defendants apparently assert that this document was created to prepare for trial or in anticipation of litigation because the lawsuit was the reason for its creation. That, however, would extend the privilege beyond its justified purpose to include those documents which merely give internal guidance as to how to handle documents being provided to counsel or in discovery. It is impossible to read this document and learn anything about the thought processes of the defendants' attorneys or the actual information they are collecting as they prepare for trial. Shielding the document would expand the work product exemption beyond the reasons for its creation merely because the document bears some connection to the litigation.

Finally, the government seeks to expunge certain material from two e-mails in document No. 105. The material sought to be expunged, however, was clearly not prepared for use in the litigation but for other purposes, *i.e.*, to discuss what certain documents (not to be used in this lawsuit) should or should not contain. Therefore, since the motivation for their creation was other than for use in this lawsuit, the work product privilege does not apply to this material.

## C. Explanation of Appendix A

An index detailing the disposition of the privilege claims as to each of the documents is contained in Appendix A to this Opinion. For each document, the index indicates, where possible, the primary author, the date of the document, and whether it was sent to or from counsel. Each document on the privilege log submitted by the defendants has a number. The Court has used this number in its index except when a document contained a primary document and several attachments or responses to it. If necessary, the Court detached the primary document from the attachments or responses. It used the number provided by the defendants for the primary document but identified the attachments or responses as separate documents using ascending decimal values. Thus, Document No. 7, for example, is now 7, 7.1, 7.2, *et cetera*.

The index also contains two descriptions of the document where possible: the subject of the document provided by its author in the document itself and the description provided by the defendants' privilege log. In documents that were subdivided, the descriptions were drafted to closely parallel those provided by the defendants in the privilege log. Finally, the index notes what privilege was claimed, whether the privilege claimed is granted or denied (not whether the motion to compel is granted or denied), and the reason for the disposition.

## II. The Additional Motions to Compel

### A. The Motion to Compel An Answer to Interrogatory No. 2

■ As noted above, defendants objected to plaintiffs' Interrogatory No. 2 which asked them to "identify all documents, data compilations, and tangible things in the possession, custody, or control of defendants that are relevant to the facts alleged in the complaint." Defendants produced, however, over 100,000 documents in response to a request for a production of documents which, according to plaintiffs' letter of July 15, 1997, sought "documents relevant to AID's reduction in force, including all documents relating to the formulation of the method of selection of employees who were laid off, and the application of that selection method."

Plaintiffs do not complain that the production was deficient and that therefore there are still "documents, data compilations and tangible things" pertaining to the RIF which have not been produced in response to the request for production of documents. Without some reason to believe that there are such "documents, data compilations and tangible things" which have not been produced, requiring the defendants to answer Interrogatory No. 2 is an academic exercise. Defendants will surely respond that they have already identified all "documents, data compilations and tangible things" and given them to the plaintiffs in response to the request for production of documents. In the absence of some reason to believe that such a statement is not true, plaintiffs' motion to compel an answer to Interrogatory No. 2 will be denied.

### B. The Motion to Compel Production of Deliberative Process Documents

█ Plaintiffs claim that their review of the documents indicated that "they have seen almost no deliberative or decisional documents of policy-level agency officials." Pls. Letter of July 15, 1997. At the status conference and argument held in this case, the defendants' counsel insisted that no such documents have been withheld. Again, the record does not permit the conclusion that the documents to which plaintiffs refer are in existence and the supposition that they must be is an inadequate basis to compel their production. The Court credits the defendants' counsel's representation at the hearing as an officer of the Court that the defendants have not surreptitiously held back documents which they would otherwise have to produce because they might be classified as deliberative. The plaintiffs' motion to compel the additional production of documents is denied for want of proof that such documents exist.

### C. The Motion to Compel Disclosure of Affirmative Defenses

█ In insisting that the defendants must advise them of the affirmative defenses upon which they will rely, plaintiffs seek to prevent learning of those defenses without an adequate opportunity to have discovery concerning them. Understandably, they do not wish to learn of the existence of those defenses when discovery has closed and the defendants have filed a motion for summary judgment.

A recent decision of the Court of Appeals provides plaintiffs with the protection they seek. In *Harris v. Secretary, U.S. Department of Veterans Affairs,* 126 F.3d 339 (D.C.Cir.1997), the Court of Appeals held that a defendant may not assert an affirmative defense for the first time in a dispositive motion: "a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion." *Id.* at 345.

Accordingly, the defendants will not be able to rely on any affirmative defense which they did not assert in their answer, unless Judge Urbina permits them to amend their answer to assert it. Plaintiffs, therefore, are fully protected against the "surprise" they fear and their motion to compel the defendants to specify their affirmative defenses is denied as moot or unnecessary.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion and Appendix, it is this 18th day of November, 1997, hereby

**ORDERED** that plaintiffs' letters of July 15, 1997, [#30] shall be deemed a motion to compel; and it is further

**ORDERED** that defendants' letters of July 25, 1997, [#25] and July 31, 1997, [#26] shall be deemed the opposition to the plaintiffs' motion to compel; and it is further

**ORDERED** that plaintiffs' motion to compel is **GRANTED IN PART** and **DENIED IN PART**. The Court holds in abeyance its ruling on the attachment to Document No. 93 until defendants respond to the Court's Supplemental Order issued November 14, 1997.