* * *
Having "demonstrate[d] beyond material doubt that its search was reasonably calculated to uncover all relevant documents," Ancient Coin , 641 F.3d at 514, EPA is entitled to summary judgment as to the adequacy of the search.
B. EPA's Withholdings Under Exemption 5
As noted, the parties dispute the withholding of 80 records, in whole or in part, under Exemption 5's deliberative process privilege, three of which records are email chains also partially withheld pursuant to the attorney-client privilege. See Def.'s 2d Reply at 22-24; Fifth EPA PIRIB Decl. ¶¶ 17-19.[6] FOIA Exemption 5 *16 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative-process privilege." Abtew v. U.S. Dep't of Homeland Sec. , 808 F.3d 895, 898 (D.C. Cir. 2015). Here, EPA relies upon both the governmental attorney-client privilege and the deliberative process privilege.
CBD challenges EPA's claim that three records are subject to withholding under the attorney-client privilege and, as a categorical matter given the statutory requirements under which the Addenda were developed, application of the deliberative process privilege to any of the records. The merits of the parties' arguments as to application of Exemption 5 are addressed in that order.
1. Application of The Attorney-Client Privilege
CBD disputes EPA's application of the attorney-client privilege to three records: Fifth Vaughn Index entry nos. 14, 37, and 64, see CBD's 2d Reply at 10, of which 14 and 37 are email chains with partial redactions, and 64 is withheld in full. The EPA has sufficiently explained the basis for these withholdings, as explained below.
The attorney-client privilege aims "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." United States v. Jicarilla Apache Nation , 564 U.S. 162, 169, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011) (quoting Upjohn Co. v. United States , 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ). These objectives apply equally to governmental clients seeking to obtain "legal advice founded on a complete and accurate factual picture," and thus "the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." Id. at 170, 131 S.Ct. 2313. To establish that the attorney-client privilege applies in the FOIA context, an agency must show that (1) "the information in [the] documents was communicated to or by an attorney as part of a professional relationship," (2) "the information is confidential," and (3) the "communication is based on confidential information provided by the client." Mead Data Ctr., Inc. v. U.S. Dep't of Air Force , 566 F.2d 242, 253-54 (D.C. Cir. 1977).
EPA states that the three emails withheld under the attorney-client privilege were "not shared with any person outside of the Agency attorneys and their clients in the Office of Pesticide Programs." Fourth EPA PIRIB Decl. ¶ 15; see also Fifth Vaughn Index at 43, 70 (stating that entries 37 and 64 were kept confidential). With respect to entry nos. 14 and 37, EPA explains that "[i]n the redacted *17 portion of each of the emails, OPP employees directly discussed advice provided to them by OGC attorneys on the potential legal vulnerabilities of possible policy options OPP was considering at the time." Fifth EPA PIRIB Decl. ¶ 17; see also Fifth Vaughn Index at 18 (stating that redacted portion of entry no. 14 "reflects OGC's impression of potential legal vulnerabilities for the draft ESA in its form at the time of the email"). CBD takes issue with the fact that "EPA did not identify an attorney as the author or recipient," Pl.'s 2d Reply at 11, but the absence of an attorney participating in communications among agency personnel relaying an attorney's legal advice does not preclude application of the privilege. See Story of Stuff Project v. U.S. Forest Serv. , 345 F.Supp.3d 79, 96 (D.D.C. 2018) (upholding application of the attorney-client privilege to emails which "relay among agency employees confidential advice supplied by the agency's lawyer"); Evans v. Atwood , 177 F.R.D. 1, 6 (D.D.C. 1997) (noting that "circulating truly confidential information among concerned officials does not defeat the privilege since all the recipients shared the attorney-client privilege with each other").
Finally, entry no. 64 is comprised of two emails in a chain, with only the second email withheld. Fifth EPA PIRIB Decl. ¶ 19. This second email is a communication between two EPA attorneys which, EPA avers, "is entirely comprised of a legal analysis of a specific portion of the draft six-state risk assessment." Id. ; see also Fifth Vaughn Index at 71 (stating that the legal advice "relate[s] to applicable statutes and EPA regulations" bearing on the proposed registration of Enlist Duo). This explanation suffices to assert the privilege.
Notwithstanding the firm basis in the EPA's explanations for assertion of the attorney-client privilege, CBD claims "there is still a mystery as to why EPA's Office of General Counsel had to provide legal advice about scientific determinations in the endangered species risk assessments." Pl.'s 2d Reply at 11. Nothing here needs further inquiry or explanation to resolve. Consultation by EPA staff with EPA attorneys about their legal obligations under the ESA and FIFRA, or other applicable statutes and regulations, is both expected and necessary, not mysterious.
Accordingly, the EPA is entitled to summary judgment on withholding the three records described at Vaughn index entry nos. 14, 37, and 64, pursuant to Exemption 5's attorney-client privilege.
2. Application of the Deliberative Process Privilege
The remaining 77 disputed records are withheld by EPA under Exemption 5's deliberative process privilege.[7] The deliberative process privilege permits an agency to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated,"
*18 Dep't of Interior v. Klamath Water Users Protective Ass'n , 532 U.S. 1, 8-9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001), in order that agencies may "craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public," Judicial Watch, Inc. v. U.S. Dep't of Defense , 847 F.3d 735, 739 (D.C. Cir. 2017).
CBD posits that EPA may not rely on the deliberative process privilege here because the records at issue were "generated in EPA's attempt to comply with Section 7(a)(2) of the Endangered Species Act" and thus "involve technical and scientific determinations about Enlist Duo's effects, including EPA's determinations in the Addenda that Enlist Duo would have 'no effect' based on mitigated impacts to listed species," for which determinations EPA cannot "identify any 'policy-making judgment.' " Pl.'s 2d Reply at 3 (quoting Petroleum Info. Corp. v. Dep't of Interior , 976 F.2d 1429, 1435 (D.C. Cir. 1992) ). Put another way, in CBD's view, withholding intra-agency records is proper only if the records " 'bear on the formulation or exercise of agency policy-oriented judgment ,' " Pl.'s 2d Opp'n at 3 (quoting Petroleum Info. Corp. , 976 F.2d at 1435 (emphasis in original) ), and such judgment cannot apply here because ESA's section 7(a)(2) does not allow it. EPA counters that "[t]he fact that the deliberations that form the basis for all of EPA's withholdings occurred in the context of a scientific determination does not deprive them of their pre-decisional or deliberative characteristics," Def.'s 2d Mem. at 17, and that CBD's "position to the contrary is based on an overly narrow application of Exemption 5," id. at 18. EPA has the better arguments both as to CBD's categorical challenge to the applicability of the deliberative process privilege to agency actions under ESA's section 7(a)(2) and to application of Exemption 5 to the specific documents at issue.
a) EPA's Actions under ESA's Section 7(a)(2) May Be Deliberative
CBD's argument that the deliberative process privilege is unavailable to exempt the disputed records from disclosure is predicated on the fact that ESA's section 7(a)(2) decision has "only two outcomes, whether an action has 'no effect' or 'may effect' endangered species." Pl.'s 1st Opp'n at 17. Due to the binary and scientific nature of this decision, CBD leaps to the conclusion that "there are no policy deliberations embedded in species effects determinations that EPA made in the Addenda." Pl.'s 1st Opp'n at 17-18; see also Pl.'s 2d Reply at 2 ("[R]ecords-generated as part of EPA's duty under Section 7(a)(2) of the Endangered Species Act-are not part of a deliberative process within the meaning of Exemption 5."). This is a leap too far.
While CBD is correct that EPA's decision under section 7(a)(2) as to Enlist Duo depends on a scientific assessment of toxicity risks to endangered and threatened species, this does not divest the agency's decisionmaking process of eligibility for Exemption 5 protection. EPA has described in detail the full scope of considerations implicated in the required risk assessment, starting with determining what scientific evidence would be relevant for such an analysis of Enlist Duo. See First EPA EFED Decl. ¶ 15 (explaining that EPA decided "whether to include registrant-submitted information" concerning "the screening level ecological risk assessment" and "volatilization of Enlist Duo's active ingredient"); id. (averring that EPA considered "whether to incorporate vapor transport data into the screening ecological *19 risk assessment"). EPA also had to determine the analytical methods and assumptions to apply to test the pesticide. See id. (averring that EPA considered "whether potential analytical methods could be employed to demonstrate" how particular tank mixtures and spray nozzles would affect spray drift).
Further, EPA's determination of whether Enlist Duo may affect endangered species does not happen in a vacuum, but rather, depends on the parameters of the pesticide's permitted use. Once the relevant data and analytical methods have been selected, the question is not whether any amount of Enlist Duo in any location will affect endangered species, but rather, whether Enlist Duo, under its approved conditions for use, may affect endangered species. EPA therefore considered what modifications may be made to EPA's proposed registration in order "to avoid effects to listed species," plus "the technical basis for such modifications" and the real-world "enforceability of contemplated measures." Supp. Decl. of Sujatha Sankula ("Second EPA EFED Decl.") ¶ 4, ECF No. 42-4. This included, for example, consideration of how "in-field spray drift buffer setbacks on the product label" could be used to protect endangered species. First EPA EFED Decl. ¶ 16c.[8] According to EPA, the "deliberative discussions allow decision makers to have access to a variety of possible risk avoidance measures and ensure that such risk avoidance measures are consistent with EPA authority under FIFRA, enforceable, and practically applicable under actual field conditions." Second EPA EFED Decl. ¶ 4.
In short, multiple decisions contribute to formulating what data to collect and how, and the relevant analytical tests to conduct and under what conditions, to reach a decision under ESA's section 7(a)(2). Consequently, EPA's "may affect" determination under the ESA is properly considered "deliberative" both because determining what information to include and how to assess that information is itself deliberative, and because, as here, EPA's decisionmaking about whether, and under what conditions, to register Enlist Duo is intertwined with discussions of how to limit the terms of its registration such that the pesticide will not affect endangered species.
Other courts have reached the same conclusion that the deliberative process privilege is available for records associated with EPA's actions under ESA's section 7(a)(2). See, e.g. , Sierra Club v. Kempthorne , 488 F.Supp.2d 1188, 1191-92 (S.D. Ala. 2007) (upholding FWS' application of the deliberative process privilege, explaining that "[w]hile a [ ] determination [under ESA section 7(a)(2) ] may sound purely factual, it is a decision based on a welter of subsidiary decisions that cannot easily be so characterized, involving such things as what actors to consider, how to weigh them, how to address gaps in the evidence, and how to reconcile inconsistencies in the *20 evidence"); Ctr. for Biological Diversity v. Norton , 336 F.Supp.2d 1155, 1160 (D.N.M. 2004) (upholding application of the deliberative process privilege to draft documents pertaining to FWS' decision not to list a species as endangered because "the statute does not prohibit the agency from creating such documentation during its process even if it must rely only on the best scientific and commercial data in reaching its final listing decision" (internal quotations removed) ).
This conclusion is also consistent with well-established law in this Circuit that the deliberative process privilege operates to shield from disclosure agency decision-making reflecting the collection, culling and assessment of factual information or scientific data. See Nat'l Sec. Archive v. CIA , 752 F.3d 460, 465 (D.C. Cir. 2014) (Kavanaugh, J.) (upholding application of the deliberative process privilege to a draft agency history because "[i]n producing a draft agency history, the writer necessarily must 'cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose,' and 'identify the significant issues' " (quoting Mapother v. Dep't of Justice , 3 F.3d 1533, 1538 (D.C. Cir. 1993) ); Urban Air Initiative, Inc. v. EPA , 271 F.Supp.3d 241, 261 (D.D.C. 2017) (A.B. Jackson, J.) (upholding application of the deliberative process privilege to "emails and other internal [EPA] records" regarding EPA's conducting a scientific study and developing an emissions model); Competitive Enter. Inst. v. Office of Sci. & Tech. Policy , 161 F.Supp.3d 120, 129-30 (D.D.C. 2016) (Mehta, J.) ("[B]ecause even disclosure of the factual material in [a White House Office of Science & Technology Policy] Letter, and nothing more, could reveal judgments made during the drafting process itself, the court will not order disclosure of any portion of the drafts."); ViroPharma Inc. v. Dep't of Health & Human Servs. , 839 F.Supp.2d 184, 193 (D.D.C. 2012) (Friedman, J.) ("[The Food and Drug Administration's] choice of what factual material and prior final agency opinions to include or remove during the drafting process [of an agency guidance] is itself often part of the deliberative process, and thus is properly exempt under Exemption 5."); Goodrich Corp. v. EPA , 593 F.Supp.2d 184, 189 (D.D.C. 2009) (Bates, J.) ("[E]ven if the data plugged into the model is itself purely factual, the selection and calibration of data is part of the deliberative process to which Exemption 5 applies.").
Indeed, CBD concedes as much, stating that "some courts in this district have found that discussions of science can be deliberative," Pl.'s 2d Reply at 7 (citing, as an example, Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n , 600 F.Supp. 114, 118-19 (D.D.C. 1984) (upholding the Consumer Product Safety Commission's application of the deliberative process privilege to withhold draft copies of a scientific report) ). Notwithstanding the weight of this authority, CBD presses its position that the deliberative process privilege is unavailable here with heavy reliance on Petroleum Info. Corp. v. Dep't of Interior , 976 F.2d 1429 (D.C. Cir. 1992) and Ctr. for Biological Diversity v. U.S. Marine Corps , Civ. No. 00-2387 (TFH), 2005 WL 3262901 (D.D.C. Sept. 19, 2005).[9] Neither case dictates the result urged by CBD.
*21 In Petroleum Info. Corp. , the D.C. Circuit rejected the Bureau of Land Management's ("BLM") withholding under the deliberative process privilege of a computer database comprised of information about public lands drawn "exclusively from documents now publicly available," 976 F.2d at 1436, which database the agency intended eventually to make public, id. at 1432. The creation of this database was an "essentially technical and facilitative" task "to organize public records in a more manageable form, and to correct any error it finds in the process." Id. at 1437. Focusing on the two facts that the information was publicly available and that BLM's "mission" and "task" in creating the database had the "salient characteristic" of "lack[ing] [ ] association with a significant policy decision," id. (emphasis in original), the D.C. Circuit concluded that the database "is not deliberative," id. at 1436. In reaching this conclusion, the Court acknowledged that BLM had a "choice of data elements" that may "demand special care and technical skill," id. at 1438, but the nature of the task itself-"reorganiz[ing] and repackag[ing] a mass of dispersed public information" rather than "winnow[ing] a mass of information into a small set of facts which, if revealed, would unveil the agency's reasoning by showing what it considered relevant (and irrelevant)," id. -was described as having an "essentially technical, record-keeping nature," id. , that "circumscribes [BLM]'s exercises of discretion and judgment *22 calls," to such extent that, in combination with the "technical, objective tenor" of the database contents, "reduces the likelihood that disclosure would result in public criticism of individual BLM employees," id. Noting that even "mundane" tasks within an agency "could be said to reflect the exercise of agency discretion in some sense," the Court explained that "[t]o be protected under Exemption 5, the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." Id. at 1436 n.8.
CBD seizes on the Petroleum Info. Corp. Court's focus on requiring agency action to relate to a "significant policy decision," id. at 1437 (emphasis in original), as a pre-requisite for the deliberative process privilege, in an effort to squeeze the scientific analysis required under ESA's section 7(a)(2) into the box of merely "technical, objective" collection of factual data that the D.C. Circuit found not to be deliberative. This effort falls far short by ignoring at least three considerations highlighted by the D.C. Circuit. First, CBD's position ignores the breadth of discretion and wide range of considerations that go into making the section 7(a)(2) risk assessment, as detailed by EPA, supra . See First EPA EFED Decl. ¶¶ 14-16; Second EPA EFED Decl. ¶¶ 4-9. Second, rather than merely piggy-backing on publicly available data from defined sources as in Petroleum Info. Corp. , the section 7(a)(2) risk assessment involves determining what tests to run and data to collect for analysis; and third, due to both those factors, the likelihood is heightened, not "reduced," Petroleum Info. Corp. , 976 F.2d at 1438, that if these " 'candid or personal' decisions," id. at 1439 (citing Coastal States Gas Corp. v. Dep't of Energy , 617 F.2d 854, 866 (D.C. Cir. 1980) ), were "revealed prematurely" they "would be likely to 'stifle honest and frank communication within the agency," id. As to the last factor, EPA indicates that release of the withheld records "would have a chilling effect on my staff's ability to have open and frank discussions weighing, considering, and evaluating scientific data, studies, reports and other relevant information in order to assist Agency management with finalizing a decision document. As with any scientific discussion, individual scientists may interpret the collection of facts and data in different was, depending upon their professional expertise and the context for which the evaluation of data takes place." Second EPA EFED Decl. ¶ 10. This consideration about chilling internal agency discussions due to the nature of the task at issue prompted the D.C. Circuit in Petroleum Info. Corp. to caution, in the last footnote, that "[a]n internal [BLM] memorandum expressing an official's opinion about the merits of proposed data elements, codes or formats might present a significantly different case for exemption." 976 F.2d at 1438 n.13.
Finally, U.S. Marine Corps , 2005 WL 3262901, which CBD also relies upon, actually undercuts CBD's position. There, the Marine Corps was ordered to release its final Biological Assessment, prepared pursuant to ESA section 7(a)(2) and 50 C.F.R. § 402.12(a), because the document "does not reflect the personal views of individuals employed by Defendant, but instead is Defendant's official position on the impact of military and other base activities on listed threatened and endangered species, which indicates that the assessment is not predecisional." 2005 WL 3262901 at *2. Crucially, the analogous documents in the instant case, the Addenda, reflecting the agency's final position, have already been made public. See Def.'s 1st Reply at 6 ("EPA is not withholding the final version of the two Addenda, whereas in the case *23 relied upon by Plaintiff, [ U.S. Marine Corps , 2005 WL 3262901 ], the agency was withholding the final version of a Biological Assessment."); see also Def.'s 2d Mem. at 14; First EPA EFED Decl. ¶ 21. Notably, in U.S. Marine Corps , the agency's application of FOIA Exemption 5's deliberative process privilege was upheld with respect to documents which "express the writer's opinion" and "[do] not reflect a final view of the agency," because their release "may [have] a chilling effect on open discourse about policies within the agency." Id. at *3. Thus, U.S. Marine Corps provides no basis for the proposition advanced by CBD that records generated pursuant to a section 7(a)(2) determination cannot be withheld under the deliberative process privilege.
b) Remaining Disputed Records
Having rejected CBD's categorical argument that Exemption 5's deliberative process privilege does not apply to documents generated by EPA as part of its ESA section 7(a)(2) assessment, the sufficiency of EPA's justifications for applying this privilege to the 77 remaining withheld records must next be examined. These remaining disputed records fall into three categories: internal email chains, internal briefing documents, and draft documents. See Second EPA EFED Decl. ¶ 3. As confirmed in the Fifth Vaughn Index, each withheld record is dated prior to the issuance of the final document to which the record relates, and CBD raises no issue with each record being "predecisional." See generally Fifth Vaughn Index (providing the date of each document withheld and the document to which it is pre-decisional); Pl.'s 2d Opp'n; Pl.'s 2d Reply. As discussed below, EPA has also sufficiently explained the deliberative content for each category of withheld records.
With respect to the internal emails withheld under the deliberative process privilege, see Fifth Vaughn Index entry nos. 2, 4, 5, 8, 14, 16, 18, 20, 23, 25, 29, 30, 33, 40, 45, 47, 48, 49, 51, 53, 55, 56, 57, 60, 61, 62, 68, 74, 81, 82, 83, 91, 94, 95, 106, 120, 122, 129, 131, EPA explains that they "reflect internal give-and-take with respect to decision points that were part of the risk screening assessment process," First EPA EFED Decl. ¶ 16; see also id. ¶ 21. These emails "include a discussion of changes made to early drafts that are attached to the emails." Id. ¶ 16. Issues discussed in the emails centered on "whether to include registrant-submitted information and data," id. ¶ 16a, and whether those data "were of sufficient rigor in methodological approach," id. ; what "potential analytical methods [ ] could be employed to demonstrate whether particular tank mixtures, formulations, and spray nozzles would result in spray drift greater than predicted with data used in the screening level ecological risk assessment," id. ¶ 16b; and the "proposed language on the buffer setbacks to be considered by management," id. ¶ 16c.
With respect to the internal briefing documents, including eleven PowerPoint presentations, see Fifth Vaughn Index entry nos. 12, 54, 58, 59, 66, 67, 84, 89, 107, 109, 123, and five other documents described as "talking points for EPA staff," an "informal paper for EPA staff to prepare for a meeting," an "internal annotated agenda for a briefing of the Assistant Administrator," "talking points and background for EPA staff to prepare for a meeting," and an "internal status report for a briefing of the Assistant Administrator," see Fifth Vaughn Index entry nos. 6, 7, 11, 26, and 76, respectively, EPA has listed the authors, the recipients, the date, the senior EPA officers being briefed, and the ESA-related issued involved. EPA explains that entry nos. 6, 7, and 26 "reflect information selected by EPA staff to inform senior officials and that contain recommendations, *24 analysis, and opinions on what issues may be raised, how to potentially respond (i.e., talking points), and other important considerations," First EPA EFED Decl. ¶ 17, and also summarize for internal use EPA's discussions with Dow regarding "measures that could be incorporated into a modified registration action to avoid an effect" to a listed plant species, the spring creek bladderpod, id. Furthermore, Vaughn index entry nos. 11, 12, 54, 58, 59, 66, 67, 76, 84, 89, and 123 "concerned EPA's effort to develop new methodologies for approaching the overall ESA consultation process, provide comparison to other ongoing actions, and were intended to inform management consideration of this evolving process." Id. ¶ 18. Finally, Vaughn index entry nos. 107 and 109 are "substantively the same" document, Fifth Vaughn Index at 124, sent on October 8, 2014 and October 13, 2014, respectively, and are presentations "that provide[ ] context and issues faced by [Office of Chemical Safety and Pollution Prevention] staff during the development of the initial registration of Enlist Duo and technical aspects of the registration for deliberation by Agency management," Fifth Vaughn Index at 122. Thus, EPA avers that both the emails and the briefing documents reflect "give and take discussions among Agency personnel involved in developing the numerous drafts of the six- and ten-state Assessments, described as withheld in full in the Agency's Vaughn Index." First EPA EFED Decl. ¶ 21.
The draft documents withheld include 21 draft Addenda, see Fifth Vaughn Index entry nos. 1, 3, 13, 15, 17, 19, 21, 22, 24, 27, 28, 36, 52, 72, 90, 92, 117, 125, 134, 137, 138, and "a draft response to comments," see Fifth Vaughn Index entry no. 75. With respect to the draft Addenda, EPA explains that these "include: (1) unformatted rough drafts of portions of [ ] what became the final documents; (2) early drafts of the documents where many of the policy issues discussed above resulted in revisions throughout the documents by staff with differences on how these issues were ultimately discussed and described, and; (3) drafts that had yet to undergo management and/or final legal review and reflect revisions and comments proposed by staff attorneys and managers with no final decision-making ability." First EPA EFED Decl. ¶ 19. EPA also explains how draft Addenda move from agency staff to management with decision-making authority. After the initial drafting, draft Addenda are "reviewed internally within the branch by the senior scientist and branch management," then, "depending on the complexities of the decision and the assessment process," they may be elevated "to the division level management during an informal meeting." Id. ¶ 20. "Once a draft version is ready to clear the division, it will be transmitted to the risk management division to ensure that the assessment accurately represents the regulatory decision under consideration," and once management in both EFED and [Registration Division within the Office of Chemical Safety and Pollution Prevention ("RD") ] are satisfied with the draft, "a final document is submitted to RD for inclusion in the decision record." Id.
EPA's explanations for its withholdings under the deliberative process privilege adequately show that draft documents, emails, and internal briefing documents at issue reveal internal discussion as part of an "iterative" process "where the premises for the risk assessment, the accuracy of assumptions, and the availability of all lines of evidence are critically evaluated." Second EPA EFED Decl. ¶ 6. Such internal discussions are protected by the deliberative process privilege. See, e.g. , Goodrich Corp. v. EPA , 593 F.Supp.2d 184, 189 (D.D.C. 2009) (Bates, J.) ("[E]volving iterations *25 of [a] model's inputs and calibrations reflect the opinions of the staff currently developing the model, which may not represent EPA's ultimate opinions relating to these matters."); Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs. , 844 F.Supp. 770, 783 (D.D.C. 1993) (holding as protected by the deliberative process privilege a draft of an agency study analyzing impurities in a dietary supplement).
While documents designated as "drafts" are not per se covered under the deliberative process privilege, and may "lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public," Arthur Andersen & Co. v. IRS , 679 F.2d 254, 258 (D.C. Cir. 1982), here EPA has already released "polished" drafts of the Addenda, see Def.'s 2d Mem. at 15 ("EPA has released drafts at a more final stage of development and closer in substance to the final, published documents."); First EPA EFED Decl. ¶ 21; Fourth EPA PIRIB Decl. ¶ 4. Although CBD wants even earlier Addenda drafts, "as a general matter, 'drafts' of documents are exempt from disclosure under the deliberative process privilege," Goodrich Corp. , 593 F.Supp.2d at 189 (citing Dudman Commc'ns Corp. v. Dep't of Air Force , 815 F.2d 1565, 1569 (D.C. Cir. 1987) and Russell v. Dep't of Air Force , 682 F.2d 1045, 1048 (D.C. Cir. 1982) ), when they reflect the deliberative back-and-forth of " 'the ideas and theories which go into the making of the law' and not 'the law itself,' " Arthur Andersen , 679 F.2d at 258 (quoting Sterling Drug, Inc. v. FTC , 450 F.2d 698, 708 (D.C. Cir. 1971) ).
In sum, EPA is entitled to summary judgment on the withholding of the 80 disputed records under Exemption 5's attorney-client privilege and deliberative process privilege, except as to the additional releases of segregable information, discussed infra Part III.C.
C. SEGREGABILITY
FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Producing segregable information is an essential ingredient for agencies' FOIA compliance, and "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." Stolt-Nielsen Transp. Grp. Ltd. v. United States , 534 F.3d 728, 734 (D.C. Cir. 2008) (quoting Sussman v. U.S. Marshals Serv. , 494 F.3d 1106, 1116 (D.C. Cir. 2007) ). For those findings, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." Id. at 1117.
Even with that presumption, "the agency must provide a 'detailed justification' for its non-segregability" but need not "provide so much detail that the exempt material would be effectively disclosed." Johnson v. Exec. Office for U.S. Attorneys , 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting Mead Data , 566 F.2d at 261 ). Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a Vaughn index describing the withheld record, suffice. Id. ; see also Loving v. Dep't of Def. , 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the Vaughn index and the agency's declaration that it released all segregable material"
*26 are "sufficient for [the segregability] determination").
Consistent with this well-settled law, EPA was previously directed, with respect to any withheld documents, to "adequately explain why further nonexempt material cannot be segregated from any exempt material," Ctr. for Biological Diversity , 279 F.Supp.3d at 153, and to do so with "a particularized explanation of non-segregability for each document," id. at 152. To this end, EPA has averred that "EPA staff [ ] conducted a review of each responsive record for segregability of non-exempt material," Fourth EPA PIRIB Decl. ¶ 12, and "performed redactions where non-exempt material could be reasonably segregated and released non-exempt portions," id. Moreover, EPA previously averred that it "conducted a line-by-line review of each record responsive to CBD's two FOIA Requests for segregability of non-exempt material," First EPA PIRIB Decl. ¶ 38, and "released all reasonably segregable, non-exempt information to CBD," id. Corroborating this description of the steps EPA took to segregate and release non-exempt information is the fact that of the 80 disputed records, half were released in redacted form. See Fifth Vaughn Index (entries 2, 4, 5, 8, 14, 16, 18, 20, 23, 25, 29, 30, 33, 37, 40, 45, 47, 48, 49, 51, 53, 55, 56, 57, 60, 61, 62, 68, 74, 81, 82, 83, 91, 94, 95, 106, 120, 122, 129, 131). Of the disputed emails, all but two have been released with redactions. Thus, in light of EPA's declarations, Vaughn index, and demonstrated good-faith effort to release redacted emails, the Court concludes that EPA has satisfied the segregability requirement with respect to the withheld emails.
Likewise, with respect to the draft Addenda and "draft response to comments" document, EPA's declarations state that any potentially non-exempt material is "inextricably intertwined with privileged information," First EPA EFED Decl. ¶ 21, and "not further segregable in any reasonable or meaningful way in light of the length and complexity of the documents," id. ; see also Fifth EPA PIRIB Decl. ¶ 15 ("Any language used [in] the draft documents that remained in the final versions are interspersed throughout the documents, often with extensive edits, making them inextricably intertwined with privileged information and not further segregable considering the length and scope of these documents."). Therefore, EPA's declarations and Vaughn index are sufficient to establish non-segregability of the draft Addenda and "draft response to comments" document.
By contrast, with respect to the PowerPoint presentations, the Court heeded the D.C. Circuit's guidance that "it [is] generally preferable for courts to make at least a preliminary assessment of the feasibility of segregating nonexempt material." Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Attorneys , 844 F.3d 246, 257 (D.C. Cir. 2016). In this regard, review of the descriptions of these presentations identify sections of the documents as "provid[ing] background, context and issues faced by staff during the early development of the" Addenda. See Fifth Vaughn Index at 15, 60, 64, 65, 73, 75, 87, 89, 90, 96, 122. These descriptions suggested that these fairly lengthy presentations contain " 'logically divisible sections,' " that may be "amendable to segregation and disclosure." Nat'l Ass'n of Criminal Def. Lawyers , 844 F.3d at 257 (quoting Mead Data , 566 F.2d at 261 n.54 ). Upon in camera review, the Court determined that the introductory slides of the PowerPoint presentations generally reflect non-deliberative, factual information that should be disclosed. See Heffernan v. Azar , 317 F.Supp.3d 94, 125 (D.D.C. 2018)
*27 ("[F]actual information which does not bear on the policy formulation is not subject to the deliberative-process privilege."). Therefore, EPA is directed to segregate and release the following pages from the documents listed in its Fifth Vaughn Index: entry no. 12, pages 1 through 8, and page 18; entry no. 58, pages 1 through 6; entry no. 59, pages 1 through 6; entry no. 66, pages 1 through 5; entry no. 67, pages 1 through 4; entry no. 84, pages 1 through 5; entry no. 89, pages 1 through 5; entry no. 107, page 1, and pages 3 through 6; entry no. 109, page 1, and pages 3 through 6; and entry no. 123, pages 1 through 6.
Finally, the Court conducted an in camera review of the non-PowerPoint briefing documents, which range from one to four pages in length. Factual information in these documents is inextricable from the remainder of the documents, and therefore the agency's non-segregability determination was proper.
IV. CONCLUSION
For the foregoing reasons, the defendant's Renewed Motion for Summary Judgment is GRANTED in part and DENIED in part, and the plaintiff's Renewed Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part. Specifically, since EPA has demonstrated the adequacy of its search and that Exemption 5's attorney-client privilege and deliberative process privilege protects the withheld records, the agency is granted summary judgment on Counts IV and V of the Complaint. EPA is denied summary judgment on Count VII and is directed to further segregate and disclose those portions of the documents listed above, supra Part III.C, by April 15, 2019. CBD is granted summary judgment on Count VII, but otherwise denied summary judgment.
The parties are further directed to submit, by April 19, 2019, a final joint status report regarding the status of the release of segregable information as directed, upon which release final summary judgment will be entered for EPA.
An order consistent with this Memorandum Opinion will be filed contemporaneously.

CBD lists 79 disputed records, see Pl.'s 2d Opp'n at 8 n.3; Pl.'s 2d XMSJ, Decl. of Stephanie M. Parent, Senior Attorney, Environmental Health Program of the Center for Biological Diversity ("CBD Counsel Decl.") ¶ 4, ECF No. 38-3 (stating that 79 records remain at issue), but that list does not include Fifth Vaughn Index entry number 37, which CBD references as disputed in its briefing, see Pl.'s 2d Opp'n at 19; Pl.'s 2d Reply at 10-11. EPA defends the withholding of this document. See Fifth EPA PIRIB Decl. ¶ 17; Def.'s 2d Reply at 23; Letter from Janet Bressant, PIRIB, EPA, to Margaret Townsend, CBD (Mar. 1, 2018), Attach. at 1, ECF No. 38-13 (listing entry no. 37 as disputed as of March 1, 2018). Therefore, the Court assumes that the parties continue to dispute Vaughn index entry no. 37, and that the total number of records in dispute is 80. In sum, EPA withholds under Exemption 5's attorney-client privilege the records described in Vaughn index entries 14, 37, and 64, and under the deliberative process privilege those same entries as well as the following entries: 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 36, 40, 45, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 66, 67, 68, 72, 74, 75, 76, 81, 82, 83, 84, 89, 90, 91, 92, 94, 95, 106, 107, 109, 117, 120, 122, 123, 124, 125, 129, 131, 134, 137, 138. The Court notes that entry 106 indicates partial withholding pursuant to the "Deliberative/Attorney Client/Attorney Work Product," but only the deliberative process privilege is addressed in the parties' briefing. Thus, any reliance by EPA on attorney-client or attorney work product privileges is waived.

These remaining withheld records include: 39 email chains; 21 draft Addenda, 11 PowerPoint presentations, one draft response to comments, and five internal agency briefing documents, described as: "talking points for EPA staff," an "informal paper for EPA staff to prepare for a meeting," an "internal annotated agenda for a briefing of the Assistant Administrator," a "talking points and background for EPA staff to prepare for a meeting," and an "internal status report for a briefing of the Assistant Administrator." See Fifth Vaughn Index entry nos. 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 36, 40, 45, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 66, 67, 68, 72, 74, 75, 76, 81, 82, 83, 84, 89, 90, 91, 92, 94, 95, 106, 107, 109, 117, 120, 122, 123, 124, 125, 129, 131, 134, 137, 138.

In an effort to minimize the decision-making process involved in EPA's "may affect" determination under ESA's section 7(a)(2), CBD argues that the ESA process should occur separately from its FIFRA-based decision-making, so that "EPA cannot convert the development of scientific effects determinations in ESA assessments into an exercise of policy judgment simply because it used discretion to purportedly eliminate effects to species through modification of the registration action." Pl.'s 2d Reply at 6. CBD fails to explain, however, why EPA must treat these two determinations-whether Enlist Duo "may affect" under ESA, and the conditions for its approval to avoid unreasonable adverse environmental effects under FIFRA-as if they were entirely walled-off from one another. EPA explains that "the Agency, at its discretion, can and often does use its authority under the FIFRA to modify federal actions (i.e., the pesticide registration issued under FIFRA) to avoid effects to listed species." Second EPA EFED Decl. ¶ 4.

CBD also relies on three non-binding, Ninth Circuit district court cases, which CBD describes as examples of "courts that have reviewed withholdings of records related to Section 7(a)(2) determinations [and] have found that such records may not be withheld under the deliberative process privilege." Pl.'s 2d Reply at 7 (citing Greenpeace v. Nat. Marine Fisheries Serv. ("Greenpeace") , 198 F.R.D. 540 (W.D. Wash. 2000), Greenpeace v. Mineta ("Mineta "), 122 F.Supp.2d 1123 (D. Haw. Nov. 15, 2000), and Nw. Envtl. Advocates v. EPA , No. 05-1876-HA, 2009 WL 349732 (D. Or. Feb. 11, 2009) ). These cases are inapposite and unhelpful to CBD's position. Neither Greenpeace nor Mineta addressed FOIA Exemption 5's deliberative process privilege since both were APA actions. In fact, the Greenpeace Court expressly declined to find binding the Ninth Circuit's ruling on the scope of Exemption 5's deliberative process privilege in Nat. Wildlife Fed. v. U.S. Forest Service , 861 F.2d 1114 (9th Cir. 1988), because that case "is a FOIA case," Greenpeace , 198 F.R.D. at 544 n.3. The Mineta Court adopted the same approach. See 122 F.Supp.2d at 1128. Remarkably, but unremarked upon by the parties, other Ninth Circuit district courts have explicitly declined to follow the reasoning in Greenpeace and Mineta even in APA cases. See, e.g. , Ctr. for Biological Diversity v. Norton , No. CIV. 01-409 (TUC ACM), 2002 WL 32136200, at *2 (D. Ariz. July 24, 2002) (holding that Greenpeace 's "definition of 'deliberative', which appears to focus solely on 'policy' decisions is overly narrow" and "inconsistent with Ninth Circuit precedent and should not be followed"); Ocean Mammal Inst. v. Gates , Civil No. 07-00254 DAE-LEK, 2008 WL 2185180, at *12 (D. Haw. May 27, 2008). (rejecting Greenpeace and Mineta holdings because their "definition of 'deliberative process' is unduly narrow and ignores numerous cases holding that the deliberative process privilege applies to the process for formulating government 'decisions' as well as government 'policies' " (quoting Ctr. for Biological Diversity v. Norton , 336 F.Supp.2d 1149, 1152 (D.N.M. 2004) ) ). More on point, in fact, the Ninth Circuit recently upheld application of Exemption 5's deliberative process privilege to withhold an agency's draft jeopardy biological opinion under ESA section 7(a)(2), see Sierra Club, Inc. v. U.S. Fish & Wildlife Serv. , 911 F.3d 967, 979 (9th Cir. 2018), rendering entirely defunct CBD's strained reliance on Greenpeace and Mineta . The last out-of-circuit district court case relied upon by CBD is Nw. Envtl. Advocates , which, notably, expressly disagreed with Greenpeace 's "conclusion that no documents related to the § 7(a)(2) consultation process are deliberative." 2009 WL 349732, at *7. Moreover, while ordering EPA to release "some of the withheld documents," id. at *8, which were "relatively polished drafts," id. at *7, the Nw. Envtl. Advocates Court upheld application of Exemption 5's deliberative process privilege to "many documents" that "express preliminary staff views or tentative opinions," "represent internal discussions concerning the method by which information is to be analyzed," or "express doubt or confusion regarding the information before the agency or how it should be interpreted," because such documents "represent the give-and-take of the agencies' internal deliberations, and their disclosure would discourage such deliberations," id. at *8. Thus, this last district court case from the Ninth Circuit provides no support for CBD's categorical position.